UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term, 2013

(Argued:  March 19, 2014
Final Submission:  April 29, 2014
Decided:  August 27, 2014)

Docket No. 11-4900

———————————

UNITED STATES OF AMERICA,
*Appellee*,

v.

ANDREW ZAYAC,
*Defendant–Appellant*.[*]

———————————

Before:  STRAUB, SACK, and LOHIER, *Circuit Judges*.

The defendant, convicted in the United States District Court for the District of Connecticut (Janet C. Hall, *Judge*) on several counts arising from the kidnapping, robbery, and murder of a drug dealer, challenges the sufficiency of the evidence against him, two evidentiary rulings, and the court's refusal to instruct the jury regarding the affirmative defense of duress.  Because we conclude that the defendant has failed to identify any error or abuse of discretion by the district court, the judgment of the district court is

AFFIRMED.

—————

[*] The Clerk of the Court is respectfully directed to amend the caption as shown.

ANDREW J. FRISCH (Jeremy B. Sporn, *of counsel*), New York, NY, *for the Defendant–Appellant*.

MICHAEL J. GUSTAFSON (Sandra S. Glover, *of counsel*), Assistant United States Attorneys, *for* Deirdre M. Daly, Acting United States Attorney for the District of Connecticut, New Haven, CT, *for the Appellee.*

SACK, *Circuit Judge*:

Andrew Zayac was convicted after a jury trial on several counts arising from his involvement in the kidnapping, robbery, and murder of a drug dealer. After rejecting his motion for a new trial and acquittal, the district court (Janet C. Hall, *Judge*) sentenced Zayac principally to two concurrent terms of life imprisonment. On this appeal, Zayac challenges the sufficiency of the evidence presented against him as to several of the counts of conviction, two of the district court's evidentiary rulings, and the court's refusal to instruct the jury regarding the affirmative defense of duress to the kidnapping and robbery charges. Because we conclude that Zayac has failed to identify any error in his conviction, we affirm the judgment of the district court.

## BACKGROUND

The evidence presented at trial established that on the evening of February 8, 2009, Zayac drove from New Rochelle, New York, to the Bronx to pick up Edward Rivera, a man from whom Zayac had previously purchased substantial quantities of marijuana for resale. Also in the car was Zayac's sometime co-worker, Heriberto Gonzalez. Zayac would later tell police that he had agreed with Rivera to

2

purchase more than $100,000 worth of marijuana on this occasion.

Rivera left his building to meet the two men, carrying two duffel bags containing some sixty pounds of marijuana. After placing the bags in the trunk of Zayac's blue Jeep, Rivera got into the back seat, and the three men drove away.

At some point thereafter, Rivera was shot twice at close range as he sat in the Jeep. Zayac and Gonzalez drove to the Padanaram Reservoir in Danbury, Connecticut. It was there that Rivera's 232-pound body was eventually discovered, having apparently been pushed and dragged to the bottom of a hill, some distance from the road.

After disposing of the body, Zayac and Gonzalez drove to the home of Zayac's girlfriend in New Rochelle, where they transferred the drugs to a vehicle that she leased. The two men then drove the Jeep to Gonzalez's residence in the Bronx, where they picked up Gonzalez's car. Surveillance video obtained from a nearby oil company showed the Jeep being set on fire soon afterward, in the early hours of the morning following the murder. Both Zayac and Gonzalez suffered severe burns that night. Zayac later instructed his girlfriend to report the Jeep, which was registered in her name, stolen and to identify him as "Kevin Hill" in her communications with police. She did so.

On March 1, 2009, agents of the United States Drug Enforcement Administration and other federal law enforcement personnel executed a search warrant at the home of Zayac's parents in Scarsdale, New York. In the course of the search, agents discovered three large bags of marijuana concealed behind wall panels, as well as medical supplies for treating burns and documents indicating that Zayac had consulted a plastic surgeon.

Zayac and his girlfriend were present at the search. He agreed to speak with investigators, and was taken to a local police station for that purpose.

Zayac met with investigators three times in the days immediately following the search. He met with them again in December 2010. His account of what transpired on the night of Rivera's murder changed each time, but he eventually settled on a narrative that put the blame for Rivera's killing and the destruction of the evidence squarely on Gonzalez.

Although Zayac did not testify at trial, a government witness recounted the version of events he gave investigators. Because that account is relevant to part of our analysis, we briefly recite the pertinent details. According to Zayac, sometime after Rivera got into the Jeep, Gonzalez produced a small semiautomatic handgun from his backpack, along with some zip ties. Gonzalez then ordered Rivera at gunpoint to put the zip ties on himself. Moments later, as Zayac drove the vehicle northward, Gonzalez shot Rivera in the chest. Gonzalez then told Zayac to be happy it was not him who was shot. Once near the Padanaram Reservoir in Danbury, Zayac turned down a secluded road and stopped on the shoulder. Gonzalez insisted that Zayac help him pull Rivera's body from the car. Zayac told investigators that he then returned to the driver's seat of the Jeep while Gonzalez disappeared down the roadside hill with the body for several minutes. When Gonzalez reappeared, the two men drove back to New York, where they proceeded to stow the marijuana at the home of Zayac's girlfriend before burning the Jeep.

### The Proceedings in the District Court

Zayac was tried before a jury and convicted of kidnapping, *see* 18 U.S.C. § 1201(a)(1); felony murder, *see id.* §§ 2, 924(c), 924(j)(1) ; robbery, *see id.* §§ 2,

4

1951(a); possession of marijuana with intent to distribute, *see id.* § 2; 21 U.S.C. § 841(a)(1), (b)(1)(D); conspiracy to use or possess a firearm in furtherance of a violent felony or drug crime, *see* 18 U.S.C. § 924(o); three counts of destroying or concealing evidence, *see id.* §§ 2, 1519; and one count of conspiracy to destroy or conceal evidence, *see id.* § 371. Gonzalez was tried separately.

Zayac's defense focused on his attempt to pin responsibility for the crimes on Gonzalez. To that end, Zayac sought to enter into evidence an empty holster and magazine recovered from Gonzalez's home during a consensual search. The defense argued that these items suggested that Gonzalez may have possessed a firearm, and that this tended to corroborate Zayac's claim that Gonzalez had killed Rivera. The district court refused to admit the proffered exhibits on the grounds that they would invite the jury to draw speculative inferences.

For its part, the government introduced the inconsistent statements Zayac had made to investigators. The defense sought to mitigate the effect of these inconsistencies by proffering the testimony of an attorney who had advised Zayac at the time the statements were made. The court heard the proffered testimony out of the presence of the jury. Zayac's former attorney recounted that Zayac had apologized to him for lying to investigators and explained that he had done so because he feared Gonzalez. The court concluded that the testimony was irrelevant, and declined to admit the evidence.

Toward the close of trial, Zayac requested that the court instruct the jury regarding the affirmative defense of duress with respect to the kidnapping, robbery, and destruction of evidence counts. The court declined to

do so, concluding that Zayac's defense failed as a matter of law because no reasonable juror could find that he lacked a reasonable opportunity to escape during the course of the criminal conduct.

After trial, Zayac moved for acquittal and a new trial, which the court denied. On November 22, 2011, the court sentenced Zayac to concurrent terms of life in prison on the kidnapping and murder counts, as well as lesser terms of years on seven other counts. This appeal followed.

## DISCUSSION

The propriety of the district court's refusal to provide requested jury instructions is a question of law, which we review *de novo*. *United States v. Nouri*, 711 F.3d 129, 143 (2d Cir.), *cert. denied*, 134 S. Ct. 309 (2013). We also review challenges to the sufficiency of the evidence underlying a criminal conviction *de novo*. *E.g.*, *United States v. Mi Sun Cho*, 713 F.3d 716, 720 (2d Cir. 2013) (per curiam). The district court's decision to exclude evidence is subject to review for abuse of discretion. *United States v. Kozeny*, 667 F.3d 122, 137 (2d Cir. 2011), *cert. denied*, 133 S. Ct. 1794 (2013).

### I. Sufficiency of the Evidence

We begin with Zayac's contentions regarding the sufficiency of the evidence underlying his convictions on the kidnapping, robbery, firearms and murder counts. A defendant "challenging the sufficiency of the evidence . . . faces an uphill battle, and bears a very heavy burden." *Mi Sun Cho*, 713 F.3d at 720 (internal quotation marks and ellipsis omitted). Although our review is *de novo*, "the evidence must be viewed in the light most favorable to the government, with all reasonable inferences drawn in its favor. The question is not whether this Court believes that the evidence at

6

trial established guilt beyond a reasonable doubt, but rather, whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (internal quotation marks, brackets, and citations omitted; emphasis in original); *accord United States v. Howard*, 214 F.3d 361, 363 (2d Cir.) ("[We] resolve all inferences from the evidence and issues of credibility in favor of the verdict."), *cert. denied*, 531 U.S. 909 (2000). Moreover, "the jury's verdict may be based on circumstantial evidence, and the Government is not required to preclude every reasonable hypothesis which is consistent with innocence." *United States v. Ogando*, 547 F.3d 102, 107 (2d Cir. 2008) (internal quotation marks and citation omitted); *accord United States v. Glenn*, 312 F.3d 58, 64 (2d Cir. 2002) ("[T]he prosecution may prove its case entirely by circumstantial evidence so long as guilt is established beyond a reasonable doubt.").

Zayac claims that his "presence in the Jeep and his association with Gonzalez, even coupled with his (just acquired) knowledge of Gonzalez's murderous and felonious intent, is insufficient to show knowing participation in" the kidnapping, robbery, firearms offenses, and murder. Appellant's Br. 38. But the convictions here did not rest only on evidence of Zayac's presence in the Jeep. The trial record contains extensive evidence from which the jury could properly have inferred Zayac's knowing participation in these crimes, including: (a) Zayac appeared to lure Rivera into a trap by offering to pay an above-market price for the marijuana and telling him not to involve any of his associates in the transaction; (b) Zayac and Gonzalez set about methodically destroying all evidence of the murder together and left the marijuana in Zayac's hands for safekeeping; and (c) Zayac actively sought to conceal his involvement in the crimes, including by instructing

7

his girlfriend to lie on his behalf and by repeatedly lying to the government regarding his role. We conclude that the jury could properly have found that Zayac either committed the charged offenses himself or that he "joined [in Gonzalez's] specific venture and shared in it, and that his efforts contributed to its success, or, in other words . . . that [he otherwise] consciously assisted the commission of the [charged] crime[s] in some active way." *Ogando*, 547 F.3d at 107 (internal quotation marks omitted). We therefore reject Zayac's contention that the evidence was insufficient to support his conviction.

## II.   The District Court's Evidentiary Rulings

We also reject Zayac's challenges to the district court's evidentiary rulings. Under Rule 403 of the Federal Rules of Evidence, a trial court may refuse to admit evidence the probative value of which "is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury." Fed. R. Evid. 403. It is well established that "so long as the district court has conscientiously balanced the proffered evidence's probative value with the risk for prejudice, its conclusion will be disturbed only if it is arbitrary or irrational." *United States v. Awadallah*, 436 F.3d 125, 131 (2d Cir. 2006).

The record reveals that the court in this case engaged in just such a conscientious balancing when it declined to admit the holster and magazine recovered from Gonzalez's house. The district court determined that this evidence, if introduced, risked leading the jury to conclude that Gonzalez owned a gun and that this gun was the murder weapon. This chain of inferences, the district court found, would have been based on speculation rather than reasoned deduction from the evidence, since the holster was empty when it was recovered, the murder weapon was not found, and

8

forensic testing had failed to establish with precision what kind of firearm was used to kill Rivera. In light of the high risk that the jury would engage in speculation, the district court concluded that the potential for prejudice outweighed the probative value of this evidence. Because we find this determination neither arbitrary nor irrational, we will not disturb it.

We also reject Zayac's challenge to the district court's refusal to admit testimony of Zayac's former attorney to the effect that Zayac lied to investigators because he feared retaliation from Gonzalez. This testimony ordinarily would be inadmissible hearsay. *See* Fed. R. Evid. 801(c), 802. In this case, however, Zayac argued, among other things, that the testimony was admissible to show his state of mind at the time he lied to the authorities and thereby to contradict the inference of guilt which the government sought to elicit by introducing Zayac's false exculpatory statements. *See* Fed R. Evid. 401, 803(3).

We need not decide whether the district court erred by refusing to admit this testimony because any such error would have been harmless. *See, e.g.*, *United States v. Miller*, 626 F.3d 682, 688 (2d Cir. 2010) ("[E]ven where we conclude that an evidentiary ruling was manifestly erroneous, we will nonetheless affirm if the error was harmless—that is, if we can conclude that the error did not affect substantial rights." (internal quotation marks omitted)), *cert. denied*, 132 S. Ct. 379 (2011); Fed. R. Crim. P. 52(a). "Under harmless error review, we ask whether we can conclude with fair assurance that the errors did not substantially influence the jury." *United States v. Oluwanisola*, 605 F.3d 124, 133 (2d Cir. 2010) (internal quotation marks omitted). A government witness twice told the jury that Zayac had indicated to investigators that he was afraid of

9

Gonzalez. Zayac's stated fear was therefore in the record, and his counsel was free to argue that this fear mitigated any inference of guilt from his inconsistent statements. We therefore find no error affecting Zayac's substantial rights and no reason to reverse the district court's determination. *See United States v. Gupta*, 747 F.3d 111, 133 (2d Cir. 2014) ("The fact that the excluded statement did no more than confirm undisputed facts . . . also contributes to our conclusion that, if the limitation on [witness] testimony was error, the error was harmless." (internal quotation marks omitted)); *Oluwanisola*, 605 F.3d at 134 (stating that, to determine whether error was harmless, we consider, among other factors, "whether the excluded material was cumulative" of other evidence and "the extent to which the defendant was otherwise permitted to advance the defense").

### III.    Zayac's Entitlement to a Duress Instruction

Finally, we consider whether Zayac was entitled to an instruction on the affirmative defense of duress with respect to the kidnapping and robbery charges (Counts One and Four, respectively).[1] We will reverse a conviction on the ground that the district court refused to give a requested jury instruction "only if the requested instruction is 'legally correct, represents a theory of defense with basis in the record that would

---

[1] Although Zayac originally sought the instruction with respect to the destruction of evidence counts (Counts Eight–Eleven) as well, we consider only those arguments he has developed on appeal. *See Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist.*, 673 F.3d 84, 107 (2d Cir. 2012) ("It is a settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." (quoting *Tolbert v. Queens Coll.*, 242 F.3d 58, 75 (2d Cir. 2001))).

lead to acquittal, and the theory is not effectively presented elsewhere in the charge.'" *United States v. Kerley*, 544 F.3d 172, 177 (2d Cir. 2008) (quoting *United States v. Doyle,* 130 F.3d 523, 540 (2d Cir. 1997)), *cert. denied*, 555 U.S. 1159 (2009). "A defendant is entitled to an instruction on an affirmative defense only if the defense has 'a foundation in the evidence.'" *United States v. Gonzalez*, 407 F.3d 118, 122 (2d Cir. 2005) (quoting *United States v. Podlog,* 35 F.3d 699, 704 (2d Cir. 1994) (internal quotation marks omitted)); *accord United States v. Hurtado*, 47 F.3d 577, 584 (2d Cir.) ("A defense theory must be charged so long as it has some foundation in the proof, no matter how tenuous that defense may appear to the trial court." (internal quotation marks omitted)), *cert. denied*, 516 U.S. 903 (1995). But "[i]f, after [a] hearing, the court finds that the defendant's evidence is insufficient as a matter of law to establish the defense, the court is under no duty to give the requested jury charge or to allow the defendant to present the evidence to the jury." *United States v. Paul*, 110 F.3d 869, 871 (2d Cir. 1997).

Criminal liability ordinarily requires the "concurrence of an evil-meaning mind with an evil-doing hand." *Morissette v. United States*, 342 U.S. 246, 251 (1952). The affirmative defense of duress excuses criminal conduct committed under circumstances from which a jury may infer that the defendant's hand was guided not by evil intent, but by the imminent threat of grievous bodily harm. The defense does not necessarily negate *mens rea*, but it "negates a conclusion of *guilt*" under the circumstances. *Dixon v. United States*, 548 U.S. 1, 6–7 (2006) (emphasis added).

A defendant invoking a duress defense must establish that, at the time of his criminal conduct, (1) he faced a threat of force (2) "sufficient to induce a well-

founded fear of impending death or serious bodily injury," and (3) he lacked a "reasonable opportunity to escape harm other than by engaging in the illegal activity." *Gonzalez*, 407 F.3d at 122. A defendant is entitled to a jury instruction regarding duress only if he makes "some showing on each element" of the defense. *Id.; accord United States v. Bakhtiari*, 913 F.2d 1053, 1057–58 (2d Cir. 1990), *cert. denied*, 499 U.S. 924 (1991). The district court here denied Zayac's requested instruction on the ground that he failed to make the requisite showing with respect to the third element, that "the defendant . . . take reasonable steps to avail himself of [a reasonable] opportunity [to escape], whether by flight or by seeking the intervention of the appropriate authorities." *United States v. Alicea*, 837 F.2d 103, 106 (2d Cir.), *cert. denied*, 488 U.S. 832 (1988).

The court began by considering the trial testimony of Special Agent Rodney George of the United States Drug Enforcement Administration, who related the statements Zayac had made over the course of his meetings with investigators. The court focused on the fourth and final meeting, a proffer session on December 16, 2010, which Zayac attended with four defense attorneys. During that meeting, Zayac described sitting alone in the driver's seat of the Jeep for several minutes as Gonzalez dragged Rivera's body out of sight down a hillside just over a guardrail adjoining the road. In a prior conversation with investigators, Zayac indicated that the murder weapon remained with him in a backpack as he waited for Gonzalez to return. The district court concluded that these minutes alone in the car constituted a reasonable opportunity to escape as a matter of law.

Having concluded that Zayac was presented with a reasonable opportunity to escape, the court next

considered whether the kidnapping and robbery offenses were ongoing at the time that opportunity arose. The court concluded that the charged crimes were ongoing and, reasoning that Zayac had failed to avail himself of a reasonable opportunity to escape his continued participation in these offenses, denied the duress instruction.

Turning to our *de novo* review of the court's rejection of Zayac's argument, we begin by agreeing with the district court that Zayac had, as a matter of law, a reasonable opportunity to escape the scene while Gonzalez was engaged in disposing of Rivera's body. Zayac's own express recollection placed him alone with the murder weapon, in the driver's seat of a vehicle, while Gonzalez was out of sight, down a hill, struggling to dispose of a 232-pound body. Under the circumstances, we think that no rational juror could have found that Zayac lacked a reasonable opportunity to escape.[2]

Zayac argues that he was entitled to a duress instruction if his own direct contribution to the crimes concluded before the escape opportunity arose. This

---

[2] Under the law of this Circuit, the "reasonableness" of an escape opportunity need not be decided by the jury absent special circumstances or the presence of a factual issue. *Alicea*, 837 F.2d at 106-07. Nor do we ordinarily consider whether the defendant's fear might have rendered him or her incapable of appreciating the existence of an objectively reasonable opportunity to escape. *See id.*; *Gonzalez*, 407 F.3d at 122 (concluding that the defendant's subjective belief that police would not believe her did not excuse failure to seek police intervention).

argument depends on the assumption that when Zayac was sitting in the Jeep near the Danbury reservoir waiting for Gonzalez to dispose of the body, Zayac's own contribution to the kidnapping, the robbery, or both had ended. We disagree with this premise, and conclude to the contrary that Zayac was participating in the crime as an accomplice during the period in which he had an opportunity to escape.

As we have explained, an element of the duress defense is the absence of a "reasonable opportunity to escape harm other than by engaging in the illegal activity." *Gonzalez*, 407 F.3d at 122. We do not read our duress jurisprudence to create a different definition of "engaging" in illegal activity for the purposes of a duress defense from that used to describe the liability of an ordinary accomplice, aider, or abettor. An accomplice who sits in a car while his partner in crime disposes of a body is not "doing nothing" in a legal sense, even if that might be an accurate layperson's description. Last term, the Supreme Court reiterated that, "[i]n proscribing aiding and abetting, Congress used language that 'comprehends all assistance rendered by words, acts, encouragement, support, or *presence* . . . '—even if that aid relates to only one (or some) of a crime's phases or elements." *Rosemond v. United States*, 134 S. Ct. 1240, 1246–47 (2014) (emphasis added; citation omitted) (quoting *Reves v. Ernst & Young*, 507 U.S. 170, 178 (1993)). So long as the defendant has "assisted" in any of these ways, he shares liability for any criminal conduct carried out by his accomplice with or without his active participation. "It is inconsequential . . . that his acts did not advance each element of the offense; all that matters is that they facilitated one component." *Id.* at 1247.

14

In other words, when an offense is ongoing, a defendant's continued presence at the scene constitutes ongoing participation absent some fact indicating that he has disassociated himself from the crime. The question then, as the district court correctly determined, is whether the relevant offense was ongoing at the time the defendant's opportunity to escape arose. We conclude as a legal matter that the violations of both the kidnapping and robbery statutes were ongoing at the time Zayac failed to take advantage of a reasonable opportunity to escape.

Section 1201, the federal kidnapping statute under which Zayac was charged, criminalizes the "carr[ying] away and hold[ing]" of a person "for ransom or reward or otherwise." 18 U.S.C. § 1201(a). The Supreme Court has explained that kidnapping under section 1201 is a "unitary crime," which, "once begun, does not end until the victim is free." *United States v. Rodriguez-Moreno*, 526 U.S. 275, 281 (1999); *see also United States v. Seals*, 130 F.3d 451, 462 (D.C. Cir. 1997) ("[T]he crime of kidnapping *continues* while the victim remains held and a ransom sought.") (emphasis in original); *United States v. Godinez*, 998 F.2d 471, 473 (7th Cir. 1993) (noting that the principle "[t]hat kidnapping is a continuing offense . . . means that the statute of limitations runs from the release rather than the capture of the victim"); *United States v. Garcia*, 854 F.2d 340, 344 (9th Cir. 1988) (same).

Contrary to Zayac's suggestion, then, the criminal act of kidnapping was not complete once Rivera was dead. Nothing in the language of the statute suggests that Congress intended that a victim be considered "free" once dead, and the text of the statute implies the contrary. *See* 18 U.S.C. § 1201(a)(1) (making clear that the law applies when a victim is transported across state

15

lines "regardless of whether the person was alive" at the time).  Nor are the evils targeted by the statute—holding "for ransom or reward or otherwise"—abated by the victim's death.[3]  Although we do not decide today precisely when a dead victim ceases to be "held" and the kidnapping offense definitively ends, we think the *earliest* the kidnapping of Rivera could have been complete was at the point when Gonzalez—according to Zayac's version of events—finally abandoned the body at the bottom of the hillside near the road.[4]  Because the unlawful holding of the victim was ongoing at a time when Zayac could reasonably have fled the scene, he was not entitled to an instruction regarding the defense of duress as to the kidnapping offense.

Our conclusion is the same with respect to the robbery count.  As this Court has explained, a robbery involves "both a taking and a carrying away," so that the "escape phase of a crime is not . . . an event occurring 'after the robbery'" but "is *part of the robbery*." *United States v. Reid*, 517 F.2d 953, 965 (2d Cir. 1975) (emphasis added) (quoting *United States v. Von Roeder*, 435 F.2d 1004, 1010 (10th Cir.), *vacated on other grounds*, 404 U.S. 67 (1971)); *see United States v. James*, 998 F.2d 74, 80 (2d Cir. 1993) ("The escape phase of the crime of bank

---

[3]  Indeed, the payment of ransom for corpses is an ancient practice. *See The Iliad of Homer* (Alexander Pope, trans., Samuel Johnson, ed. 1779), Book XXIV, ln 169–174 ("No longer then ([Jove's] fury if thou dread)/Detain the relicks of great Hector dead;/Nor vent on senseless earth thy vengeance vain:/But yield to ransom and restore the slain.").

[4]  We need not and do not decide whether a victim continues to be "held" for "ransom or reward or otherwise" if, for example, the victim's abandoned remains lie undiscovered while the perpetrators send ransom notes to the victim's family or await the payment of a ransom.

16

robbery is part of the ongoing robbery, not an event occurring after the robbery, for purposes of characterizing the involvement of a party who knowingly and willfully joins in the escape phase only."). In this case, the escape phase continued at least until Zayac and Gonzalez returned to New Rochelle, where they transferred the stolen marijuana to another vehicle together. *See United States v. Grubczak*, 793 F.2d 458, 464 (2d Cir. 1986) (robbery continued while defendant extracted stolen money from stolen armored car used as getaway vehicle and transferred it to another vehicle over two hours after the robbery began); *United States v. Willis*, 559 F.2d 443, 444 (5th Cir. 1977) (per curiam) ("The crime of larceny obviously continues as long as the asportation continues and the original asportation continues at least so long as the perpetrator of the crime indicates by his actions that he is dissatisfied with the location of the stolen goods immediately after the crime . . . ." (quoting *United States v. Barlow*, 470 F.2d 1245, 1253 (D.C. Cir. 1972))). We therefore conclude that Zayac also failed to establish his entitlement to a duress instruction on the robbery count.

As we have explained, duress "negates a conclusion of guilt" based on a defendant's otherwise culpable conduct. *Dixon*, 548 U.S. at 7 & n.5 (citing 2 Wayne R. LaFave, *Substantive Criminal Law* § 9.7(a) (2003)). In this case, Zayac sat for several minutes, alone and in possession of a firearm, in the driver's seat of an automobile that had just been the scene of a kidnapping, robbery, and murder, awaiting the return of his accomplice, who was out of sight disposing of the victim's body. The law does not recognize a duress defense in these circumstances, and a defendant in Zayac's position has no right to a jury instruction suggesting otherwise.

17

## CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.