USA v. Hernandez

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2017

(Argued: April 18, 2018                    Decided: July 9, 2018)

Docket No. 16-2765

_____

UNITED STATES OF AMERICA,

*Appellee*,

- v. -

EDWIN HERNANDEZ, AKA Scooby, AKA Masacre,

*Defendant-Appellant*.[*]

_____

Before: KEARSE, CABRANES, and LOHIER, *Circuit Judges*.

---

[*]    The Clerk of Court is instructed to amend the official caption to conform
with the above.

Appeal from a judgment of the United States District Court for the Eastern District of New York, Joseph F. Bianco, *Judge*, convicting defendant of assault with a dangerous weapon, in violation of 18 U.S.C. § 1959(a)(3), and discharge of a firearm during a crime of violence, in violation of *id*. § 924(c)(1)(A), and sentencing him principally to 300 months' imprisonment. On appeal, defendant contends principally that the district court (1) in instructing the jury, incorrectly stated the elements of his affirmative defense which claimed that his shooting as a member of the MS-13 gang was performed under duress, and (2) in sentencing him, improperly found that he had committed attempted murder, because the jury, in acquitting him of that charge, may have accepted his defense of duress. Finding no merit in defendant's contentions, we affirm his conviction and sentence.

Affirmed.

> MEGAN FARRELL, Assistant United States Attorney, Brooklyn, New York (Bridget M. Rohde, Acting United States Attorney for the Eastern District of New York, Peter A. Norling, Emily Berger, Raymond Tierney, Assistant United States Attorneys, Brooklyn, New York, on the brief), *for Appellee*.

> MURRAY E. SINGER, Port Washington, New York, *for Defendant-Appellant*.

KEARSE, *Circuit Judge*:

Defendant Edwin Hernandez appeals from a judgment entered in the United States District Court for the Eastern District of New York convicting him, following a jury trial before Joseph F. Bianco, *Judge*, of assault with a dangerous weapon for the purpose of gaining entrance to, or maintaining or increasing his position in, the gang La Mara Salvatrucha ("MS-13"), in violation of 18 U.S.C. § 1959(a)(3) (Count Five), and discharge of a firearm during a crime of violence, in violation of *id*. § 924(c)(1)(A) (Count Six), and sentencing him principally to 180 months' imprisonment on Count Five, plus 120 months' imprisonment on Count Six, to run consecutively. On appeal, Hernandez challenges his conviction, contending that the district court incorrectly instructed the jury on the elements of his affirmative defense which claimed that as a member of MS-13 he participated in the shootings in question under duress. In addition, Hernandez challenges his sentence, arguing chiefly that the district court improperly found that his relevant conduct included attempted murder, one of the charges on which the jury acquitted him and "may" (*e.g.*, Hernandez brief on appeal at 25) have done so because it found duress.

Finding no merit in Hernandez's contentions, we affirm.

3

# I. BACKGROUND

The present prosecution arises out of shootings on October 23, 2011, in Central Islip, New York, in which Robert Faber and Curtis Williams were injured. The operative indictment charged Hernandez in six counts, three with respect to each victim. Counts Four and Five alleged that Hernandez, for the purpose of gaining entrance to, and maintaining or increasing his position in, MS-13, attempted to murder Williams and assaulted him with a dangerous weapon, in violation of 18 U.S.C. §§ 1959(a)(5) and (a)(3), respectively; Count Six charged Hernandez with discharging a firearm during a crime of violence--*i.e.*, the crimes alleged in Counts Four and Five--in violation of 18 U.S.C. § 924(c)(1)(A). Counts One through Three alleged that Hernandez committed crimes against Faber paralleling those alleged with respect to Williams in Counts Four through Six. The jury found Hernandez guilty on Counts Five and Six, but acquitted him on Counts One through Four.

## A. *The Government's Evidence at Trial*

The government's evidence at Hernandez's trial included testimony by several members of state and federal law enforcement and by three former members of MS-13. We describe the evidence in the light most favorable to the government.

1. *Rules of MS-13*

The bulk of the evidence as to the organization and workings of MS-13, Hernandez's quest for membership, and his eventual admission to membership, was provided by the witnesses who were former MS-13 members. MS-13 is an international gang that engages in narcotics trafficking, extortion, witness tampering, and retaliation, and whose members frequently commit violent crimes such as robbery, assault, and murder. (*See, e.g.*, Trial Transcript ("Tr.") at 201, 379, 386, 598.) MS-13 is divided into groups called "cliques," one of which is based in Brentwood, New York, and is called Brentwood Locos Salvatrucha ("BLS"). (*Id*. at 152-53, 181.)

It may take years for a person wishing to join MS-13 to be accepted into membership, because MS-13 takes care to assure itself that prospective members can be trusted. Once an MS-13 clique has decided to accept a person for membership, his initiation has essentially two phases. He is "jumped in," which means being beaten by three current MS-13 members for 13 seconds. (*See id*. at 169.) And he must "put in work," which in the initiation context means he must kill someone (*see id*. at 254)-- preferably a member or members of a rival gang (*see, e.g., id*. at 381, 508). To become an MS-13 member, one also must agree to the rules of the gang, which include

5

requirements to help fellow MS-13 members, attend meetings, pay dues, and shoot members of rival gangs. A violation of the rules can lead to another 13-second beating or, for a serious infraction, death. Prospective members are informed of these rules before joining MS-13.

If a prospective member decides prior to being "jumped in" or "putting in work" that he has changed his mind and does not wish to be an MS-13 member, MS-13 does not force him to join: It would be concerned that such a person would not follow orders and worried that he could not be trusted. Nor does MS-13 take any adverse action against such a person; it no longer "allow[s him] to engage in any [MS-13] business" (Tr. 534) and "just le[aves] him alone" (*id*. at 174).

2. *Hernandez Is Allowed To Join MS-13 After Years of Trying*

Former MS-13 member José Alvarenga, who had joined MS-13's BLS clique around 2006, testified that Hernandez became a member of BLS in the fall of 2011. Alvarenga testified that neither he nor any other member of BLS forced Hernandez to join; no one threatened him or threatened his family to get him to join. (Tr. 171.)

6

Alvarenga testified that he first met Hernandez in 2009, after a BLS member known as "Furia" had gotten into an altercation with a member of another gang at a deli that BLS considered its territory, and Hernandez joined the fight in aid of Furia. Hernandez thereafter told Furia that he would like to join BLS. Hernandez was not allowed to join at that time, but Furia essentially sponsored him for membership. For example, Alvarenga testified that late in 2009 Hernandez joined Furia and another BLS member in hunting for rival gang members and shooting at them with shotguns. (*See* Tr. 157-60.) "[Furia] took [Hernandez] out to do a shooting, because that's what you have to do to be a member of the clique." (*Id*. at 158; *see also id*. at 555-58 (former MS-13 member Jonathan Ayala testifying that Hernandez, Furia, and others came to Ayala's house to pick up BLS guns for the late 2009 hunt); *id*. at 625, 633 (Ayala testifying that while he and Hernandez were prison mates for some six or seven months in 2012-2013, Hernandez discussed shooting the shotgun he had gotten from Ayala).)

Alvarenga also testified that in 2011, Hernandez joined two other BLS members, known as "Nino" and "Bello," in going hunting for rival gang members in Brentwood. Finding none there, they went to a nearby town, found some, and shot

7

them--or at least shot at them. (*See* Tr. 160-62; *see also id*. at 559 (Ayala describing Hernandez and Nino coming to Ayala's house to get the needed guns)).)

Alvarenga testified that despite participating in the deli fight and the above two shooting trips, Hernandez had not been allowed to join BLS until late 2011 in part because "at that moment, we weren't really taking anybody." (Tr. 162.) Also, though Hernandez had fired shots, he apparently had missed, and "he had to shoot somebody and it had to be confirmed for us to really jump him in the clique." (*Id*.)

Hernandez was finally allowed to join the BLS clique in late September or early October 2011 because BLS decided it needed more members. (*See* Tr. 163.) Alvarenga testified that in the fall of 2011, Hector Torres, the leader of BLS (*see id*.), had a close relationship with Hernandez and had become Hernandez's sponsor (*id*. at 164; *see also id*. at 163 (Alvarenga knew that Hernandez had been invited to join the Coronado clique of MS-13, "[b]ut he said he didn't want to jump in with Coronado. He wanted to jump in with us.").) Alvarenga testified that before Hernandez was "jumped in," Alvarenga and other BLS members explained the MS-13 rules to him, and told him that he would have to commit a shooting within 30 days of joining. Hernandez said he wanted to join; he "agreed to everything." (Tr. 168; *see also id*. at 335 ("Q. He had agreed to what? A. To do the murders.").)

The government also introduced a postarrest statement given by Hernandez under penalty of perjury, in which he stated that he "'was told by members of the clique that [he] would have to represent the MS-13 by fighting and killing rival gang[] [members].'" (Tr. 666.)

3. *The October 23 Shooting of Williams and Faber*

Alvarenga testified that on the night of October 22, 2011, he, Hernandez, and other BLS members discussed that Hernandez would do a shooting that night. Accordingly, Hernandez and BLS member Jerry Reyes began driving around in a Nissan Altima--owned by BLS and used specifically for shootings--hunting for rival gang members. They found victims around 1:00 a.m. on October 23.

As described by witnesses to the ensuing shootings, including the victims--and by Hernandez himself in his postarrest statement--Hernandez and Reyes drove slowly by a group of men standing outside of a house in Central Islip, parked their car nearby, returned on foot, and opened fire on the group. Hernandez and Reyes each fired several shots. The group at which they fired included Faber, who was shot in the elbow, and Williams, who was shot twice in the arm and once in a vertebra. Hernandez and Reyes then ran back to their car and sped away.

Hernandez, in his postarrest statement, had described the event as follows:

> "Towards the end of October of last year, [Reyes] stopped by my house . . . . [and] told me we were going to put in work for the clique. He told me he was going to drive me around so we could do a shooting of [rival gang members]. I got into the car he was driving. It was a reddish Nissan Altima. . . . He drove by a house and there were a lot of black people outside . . . .
>
> ["]At that point, [Reyes] said, [w]e are going to shoot them. He . . . parked about a half a block from the house. . . . [Reyes] had two guns. He had a 9-millimeter handgun and .22-caliber handgun. [Reyes] gave me the .22-cali[b]er handgun and told me that was the gun I would use. We got out of the [car] and I held the gun by my side. We got close to the group, about four or five people. We were about 25 feet away. *I aimed at the group* and *I fired several times*. I heard [Reyes] fire several times also. We both then ran to the car and [Reyes] drove away fast."

(Tr. 666-67 (emphases ours).) Three .22-caliber shell casings were recovered from the scene of the crime.

Shortly after the shooting, Alvarenga and other gang members met with Hernandez briefly and learned that Hernandez had fired shots, although Alvarenga was not sure that anyone had been hit until he saw a news report the next day. Alvarenga testified that the shootings that injured Faber and Williams were not sufficient to make Hernandez a "full member" "[b]ecause his mission was to kill." (Tr. 254.)

Nonetheless, Hernandez continued his involvement with MS-13, attending clique meetings, getting "BLS" tattooed on his back, participating in the "jumping in" of a new member, and voting to have two members of MS-13 killed. Indeed, after Alvarenga and Torres were arrested in January 2012, Hernandez became BLS's leader (*see* Tr. 266; *see also id*. at 564-66).

B. *Hernandez's Duress Defense*

Hernandez, the only defense witness at trial, testified that he had joined MS-13 in October 2011 only to protect himself and his daughter. He testified that two BLS members were out to get him because he had cooperated with the police and prosecutors against them. He also said that BLS member "Nino" showed him a letter from Ayala to Torres, which stated that Hernandez was a member of a rival gang and that BLS should "kill" Hernandez as soon as possible. (Tr. 833.) Hernandez testified that Torres--with whom he said he was "neither friends nor enemies" (*id*. at 839)-- suggested that he join BLS (*e.g., id*. at 845). He testified that Torres told him that if he joined he would not have to kill anyone. (Tr. 847.)

On the night of the Faber-Williams shooting, according to Hernandez, he did not know that he was going to be asked to "put in work" until after he got into

11

the car with Reyes and that he did not "want to shoot anybody that night" (Tr. 853). He testified that, after getting into the car with Reyes, Reyes and another gang member told him he had to complete a shooting, and that Alvarenga later told him that if he did not complete a shooting, Hernandez would be beaten with a bat, which Hernandez said he interpreted to mean that he would be killed.

Upon seeing Williams, Faber, and other men outside a house, Reyes directed Hernandez to get out of the car with him and shoot them. Hernandez testified that he fired his gun because he was "afraid," but that he did not "aim" the weapon. (Tr. 862, 861.) He said he did not "intend to kill" anyone that night. (*Id.* at 863.)

Hernandez--who at about 3:00 a.m. on the night of the shooting was riding with Torres and Reyes in a car that was stopped by police (*see* Tr. 338-42)-- admitted that he did not tell the police that night that MS-13 or BLS or anyone had threatened him or that he feared for his or his family's safety. Hernandez also acknowledged that after he was arrested in 2012 he did not tell the authorities about such threats either at the time of his arrest or in his ensuing interviews with prosecutors.

C. *The Jury Instructions on Duress*

With respect to his claim of duress, Hernandez asked that the jury be instructed that that defense has the following three elements:

> First, that the defendant acted under a threat of force directed at him at the time of his conduct,
>
> Second, that the threat of force was sufficient to induce a well-founded fear of impending death or serious bodily injury, and
>
> Third, that he did not have a reasonable opportunity to escape the harm other than by engaging in the illegal activity, that is, that he lacked a reasonable means to escape the threatening conduct by seeking the intervention of the appropriate authorities.

(Hernandez's Requested Duress Instruction, dated February 5, 2015, at 1.) The instructions given by the court, while substantially tracking the substance of most of Hernandez's suggested language, added, over Hernandez's objection, an explanation as to the third element of the defense. After instructing that the duress defense was not to be reached unless the jury found that the government had proven all of the elements of the charged offense beyond a reasonable doubt (*see* Tr. 1202), the court instructed the jury that in order to find that Hernandez had established his duress defense by a preponderance of the evidence, it must find:

13

First, that the defendant acted under a threat of force at the time of the alleged shootings on October 23, 2011;[]

Second, that such threat of force was of a sufficient nature to induce a well-founded fear of impending death or serious bodily injury to the defendant or others;

And third, that the defendant had no reasonable opportunity to avoid the threatened harm other than by engaging in the illegal activity.[]

With respect to the third element, if you find that the *defendant recklessly or negligently placed himself in a situation in which it was probable that he would be subject to duress, this element is not satisfied*.

(*Id*. at 1202-03 (emphasis added).)

D. *The Verdict and the Sentence*

The jury found Hernandez guilty on Count Five, assaulting Williams with a dangerous weapon for the purpose of gaining entrance to, or maintaining or increasing his position in MS-13, in violation of 18 U.S.C. § 1959(a)(3), and on Count Six, discharge of a firearm during that crime of violence against Williams, in violation of 18 U.S.C. § 924(c)(1)(A). It found Hernandez not guilty on Counts One through Three, the alleged crimes against Faber, and not guilty on Count Four, the alleged attempted murder of Williams.

14

Insofar as is relevant to this appeal, the presentence report ("PSR") prepared on Hernandez with respect to the advisory Sentencing Guidelines ("Guidelines") recommended (a) that the district court find by a preponderance of the evidence that the shooting of Williams by Hernandez constituted attempted murder, given the trial evidence that Hernandez had participated in the shooting in order to satisfy MS-13's requirement that he "put in work," making his base offense level 33; and (b) that the court add two offense level steps on the ground that Hernandez had attempted to obstruct justice by giving perjurious testimony at trial. After adding another four steps for the life-threatening nature of Williams's injuries, the PSR calculated that Hernandez's total offense level should be 39. Given Hernandez's criminal history category of I, the recommended range of imprisonment on Count Five would be 262 to 327 months; however, since the statutory maximum term of imprisonment for a conviction under § 1959(a)(3) is 20 years, the effective Guidelines range for Hernandez's Count Five conviction was 240 months' imprisonment.

Hernandez's conviction on Count Six called for a 10-year mandatory minimum term of imprisonment, which was required to run consecutively to his sentence on any other count. *See* 18 U.S.C. § 924(c)(1)(A)(iii).

Hernandez objected to, *inter alia*, the PSR's recommendation that the court find that he had attempted to murder Williams. He argued that "the *jury was not asked to indicate the basis for its verdicts*, i.e., whether a verdict of not guilty was based on an insufficiency of the prosecution's evidence or whether it was based on a determination that the defense had established the affirmative defense [of duress] by a preponderance of the evidence," and thus that there was "*no way to know* whether the jury believed Mr. Hernandez, but compromised, or whether the jury disbelieved Mr. Hernandez." (Hernandez's Sentencing Letter dated January 13, 2016, at 2, 3 (emphases added).) Hernandez concluded that the "*possibility* that the jury," in acquitting him of attempted murder, had "found the affirmative defense [of duress] to have been proven" and had convicted him of assault and discharge of a deadly weapon in the course of the assault merely as "a compromise verdict, should preclude the Court from considering [attempted murder] as relevant conduct for purposes of sentencing." (*Id*. at 3 (emphasis added).)

The district court rejected Hernandez's arguments, found "by a preponderance of the evidence that the defendant intended to kill Mr. Williams" (Sentencing Transcript ("Sentencing Tr.") at 18), and adopted the recommendations

16

of the PSR. As to Hernandez's intention to commit murder, the court found that the evidence

> was overwhelming. Just by way of summary in terms of the evidence in the case, the objective of the gang, and MS-13 gang's well-known objective is to kill . . . rival gang members . . . . Certainly the evidence of this particular shooting overwhelmingly supports that Mr. Hernandez intended to kill Mr. Williams and fired multiple shots with a 22-caliber, which is corroborated not just by testimony, but by the shell casings.

(*Id*.) The court noted that there was no finding by the jury that precluded such a conclusion, and thus, the court was authorized, in fashioning an appropriate sentence, to consider Hernandez's intent to commit murder.

As to the recommended obstruction-of-justice adjustment, the court found "by a preponderance of the evidence that the defendant lied during his testimony at trial" and that "he lied during the investigation, and obstructed the investigation." (*Id*. at 25.) It found that Hernandez "consciously" obstructed justice, that he "knew in order for him to persuade this jury he needed additional facts, and he invented facts during his testimony, suggesting that all of his testimony was made up." (*Id*. at 26.)

The court ultimately sentenced Hernandez principally to a total of 300 months' imprisonment, comprising a below-Guidelines-range term of 180 months on

Count Five, to be followed by the mandatory minimum of 10 years on Count Six. The court also stated that it would "give the same exact sentence, even if I were to conclude that this was . . . an assault with a gun, a shooting with no intent to murder." (*Id*. at 46; *see also id*. at 47 ("Even if the assault guidelines are applied and the guideline calculations were different, I would utilize my discretion under [the 18 U.S.C. §] 3553(a) factors to sentence him for the reasons I indicate.").)

## II. DISCUSSION

On appeal, Hernandez contends principally (A) that the district court gave erroneous instructions to the jury on his defense of duress, and (B) that in determining his sentence, the court should not have considered attempted murder because of the possibility that the jury might have found his duress defense proven by a preponderance of the evidence and found him guilty on Counts Five and Six merely as a compromise. For the reasons that follow, we find no merit in his contentions.

A. *The Instruction on the Defense of Duress*

Hernandez contends that the district court erred in instructing the jury that it should not find that Hernandez established duress if it found that he recklessly or negligently placed himself in a situation in which it was probable that he would be subject to pressure to commit violent acts. He argues, *inter alia*, that this instruction is inconsistent with this Circuit's law on duress (*see* Hernandez brief on appeal at 17-23) and that it "relied on certain factual findings by the court that were not supported by the record" (*id*. at 23). His contentions are meritless.

An accused relying on a defense of duress is required to establish each of the elements of the defense by a preponderance of the evidence. *See Dixon v. United States*, 548 U.S. 1, 8 (2006). In this Circuit, we have held that

> [t]hree discrete elements must be met to establish coercion or duress. These are: (1) a threat of force directed at the time of the defendant's conduct; (2) a threat sufficient to induce a well-founded fear of impending death or serious bodily injury; and (3) a lack of a reasonable opportunity to escape harm other than by engaging in the illegal activity. *See* [*United States v. Podlog*, 35 F.3d 699, 704 (2d Cir. 1994)]; *see also United States v. Stevens*, 985 F.2d 1175, 1181 (2d Cir. 1993). A defendant must make some showing on each element, including the element that the defendant lacked a reasonable means to escape the threatening conduct "by seeking the intervention of the appropriate authorities." *United States v. Bakhtiari*, 913 F.2d 1053, 1058 (2d Cir. 1990) (internal quotation marks omitted); *see also United States v. Bailey*, 444 U.S. 394, 410,

19

100 S.Ct. 624, 62 L.Ed.2d 575 (1980) (holding that there is no duress when there exists "a reasonable, legal alternative to violating the law, a chance both to refuse to do the criminal act and also to avoid the threatened harm") (internal quotation marks omitted).

*United States v. Gonzalez*, 407 F.3d 118, 122 (2d Cir. 2005); *see, e.g., United States v. Zayac*, 765 F.3d 112, 120 (2d Cir. 2014), *cert. denied*, 135 S. Ct. 2858 (2015).  Depending on the circumstances of the case, further explanation--or a caveat--to the jury as to these elements may be warranted.

In *United States v. Paul*, 110 F.3d 869 (2d Cir. 1997) ("*Paul*"), we concluded that the defendant was entitled to a new trial because the jury should have been given an instruction on duress.  In remanding, we noted the above elements of that defense, including the lack of a reasonable opportunity to escape harm other than by engaging in the illegal activity, and we included the caveat that the duress "defense fails if the defendant *recklessly* placed himself in a position in which it was probable that he would be subject to duress." *Id*. at 871 (emphasis added).  In *United States v. Agard*, 605 F.2d 665 (2d Cir. 1979) ("*Agard*"), we had given the same caveat, that duress "will not constitute a valid legal excuse when the defendant has *recklessly or negligently* placed himself in a situation in which it was probable that he would be subject to duress," *id*. at 667 (citing Model Penal Code § 2.09(2) (Ten. Draft No. 1960) (emphasis

20

added)). We concluded that Agard was not entitled to have the jury instructed as to the duress defense where he "contend[ed] that he was compelled to use a rifle . . . because he was in the midst of a fight and felt that his life was in danger," but he "admitted that he initiated the altercation, which resulted in his seeking a weapon," *Agard*, 605 F.2d at 668, and thus likely recklessly or negligently placed himself in the position of needing the weapon, *see id*.

Although Hernandez argues that *Agard* and *Paul* are decisions from 1979 and 1997, respectively, and that the "recklessly or negligently" caveat has not been mentioned in more recent cases dealing with the duress defense, we cannot conclude that the law of this Circuit has changed. We are bound by prior decisions of this Court unless and until the precedents are reversed *en banc* or by the Supreme Court, *see, e.g., United States v. Jass*, 569 F.3d 47, 58 (2d Cir. 2009), *cert. denied*, 559 U.S. 1087 (2010); and *Paul* and *Agard* have not been reversed or even questioned. Indeed, § 2.09(2) of the Model Penal Code, a tentative draft of which was cited in *Agard*, currently contains the same caveat, that the duress defense

> is unavailable if the actor recklessly placed himself in a situation in which it was probable that he would be subjected to duress. The defense is also unavailable if he was negligent in placing himself in such a situation, whenever negligence suffices to establish culpability for the offense charged.

21

Model Penal Code § 2.09(2) (1985). We note also that while the Supreme Court has not adopted a definition of the duress defense, the *Dixon* Court--in ruling that the burden is on the defendant to establish the elements of the defense by a preponderance of the evidence--"presume[d] the accuracy of the District Court's description of these elements," one of which was that "the defendant had *not recklessly or negligently placed herself in a situation in which it was probable that she would be forced to perform the criminal conduct*," 548 U.S. at 4 n.2 (emphasis added).

We conclude that the instruction as given accurately reflected the law of this Circuit. And the evidence presented through the testimony of former MS-13 members as to the acts of violence in which Hernandez engaged as he was repeatedly seeking membership in MS-13's BLS clique, and which culminated in his leadership of BLS, dispelled any notion that Hernandez was involved in the October 2011 shooting through no fault of his own.

Hernandez's additional contention that the court's caveat with respect to the duress defense "relied on certain factual findings by the court that were not supported by the record" (Hernandez brief on appeal at 23) is a contention that itself is not supported by the record. Hernandez does not point to any specific findings, and the court in instructing the jury did not state any.

22

Finally, we note that we also tend to agree with the district court that Hernandez probably was not entitled to a duress instruction at all, since he admitted that he knew the MS-13 rules prior to becoming a member, and "in voluntarily joining a gang, you can't claim later that you were required to do something violent for the gang" (Tr. at 1250). Thus, even if we were to conclude that the instructions as given were erroneous, the error would afford no ground for relief. *See, e.g.*, Fed. R. Crim. P. 52(a) (an "error . . . that does not affect substantial rights must be disregarded"); *United States v. Bertman*, 686 F.2d 772, 775 (9th Cir. 1982) (error in the trial court's instruction on coercion "was harmless" where the defendant did not present evidence at trial "sufficient to entitle him to an instruction on the defense of coercion").

B. *Inclusion of Attempted Murder in Hernandez's Relevant Conduct*

Finally, Hernandez contends that the district court could not properly make a finding by a preponderance of the evidence that he had attempted to murder Williams and take that finding into account in assessing Hernandez's relevant conduct for purposes of sentencing. Hernandez does not dispute that "ordinar[ily] . . . a court may use acquitted conduct as relevant conduct to determine the [defendant's] guideline range . . . because the standard of proof for using relevant

23

conduct is lower than it is for a conviction." (Hernandez brief on appeal at 25 (citing *United States v. Watts*, 519 U.S. 148, 156 (1997)).) Rather, he argues that the jury might have acquitted him on the attempted murder charge because it found Hernandez's duress defense to be meritorious, thereby negating any conclusion of guilt. This contention need not detain us long.

As to the counts charging attempted murder or assault, the jury was asked simply whether its verdict was guilty or not guilty. No questions were put to the jury that could reveal the basis for its decision on any count. As defense counsel noted, "[n]either side asked for a special verdict with regard to th[e duress] issue." (Sentencing Tr. 6.) Although special verdicts and interrogatories are generally disfavored in criminal cases, *see United States v. Bell*, 584 F.3d 478, 484 (2d Cir. 2009), "where the specific information sought [would be] relevant to the sentence to be imposed, it is not error to request it of the jury," *United States v. Stassi*, 544 F.2d 579, 583 (2d Cir. 1976), *cert. denied*, 430 U.S. 907 (1977). As no special verdict or interrogatories were requested, the jury's consequent "silence" on the basis of its verdict "signifies nothing," *see United States v. Garcia*, 938 F.2d 12, 15 (2d Cir. 1991), *cert. denied*, 502 U.S. 1030 (1992).

We decline Hernandez's invitation to rule that the court's normal authority to make findings relevant to sentencing vanished because of a speculative "possibility" (Hernandez brief on appeal at 15, 29, 32).

CONCLUSION

We have considered all of Hernandez's arguments on this appeal and have found them to be without merit. The judgment of the district court is affirmed.